METROPOLITAN TRANSPORTATION
AUTHORITY, NEW YORK CITY TRANSIT
AUTHORITY, MANHATTAN AND BRONX
SURFACE TRANSIT OPERATING
AUTHORITY, TRIBOROUGH BRIDGE AND
TUNNEL AUTHORITY, LONG ISLAND
RAIL ROAD COMPANY, METRO-NORTH
COMMUTER RAILROAD COMPANY, MTA
BUS COMPANY, METROPOLITAN
SUBURBAN BUS AUTHORITY, and
STATEN ISLAND RAPID TRANSIT
OPERATING AUTHORITY,

      Plaintiffs,

  v.

VISA U.S.A., INC., VISA, INC., VISA
INTERNATIONAL SERVICE ASSOCIATION,
MASTERCARD INC., and MASTERCARD
INTERNATIONAL INC.,

      Defendants.

**CASE NO.**

**COMPLAINT**

# I. INTRODUCTION

1. Plaintiffs, Metropolitan Transportation Authority (the "MTA") a public benefit corporation created pursuant to Article 5 of Title II of the Public Authorities Law of the State of New York, on behalf of its subsidiaries and affiliates, including: New York City Transit Authority ("NYCTA") and its subsidiary Manhattan and Bronx Surface Transit Operating Authority ("MaBSTOA"); Triborough Bridge and Tunnel Authority ("MTA Bridges and Tunnels"); Long Island Rail Road Company ("LIRR"); Metro-North Commuter Railroad Company ("Metro-North"); MTA Bus Company ("MTA Bus"); Metropolitan Suburban Bus Authority ("Long Island Bus"); and Staten Island Rapid Transit Operating Authority ("SIR") (collectively, "Plaintiffs"), bring this action (the "Action") against Visa U.S.A., Inc., Visa, Inc., and Visa International Service Association (collectively "Visa") and MasterCard, Inc. and MasterCard International, Inc. (collectively "MasterCard") (together with Visa, the "Defendants"). Defendants have, and continue to, manage, coordinate, and govern a combination in restraint of trade within the meaning of the Sherman Antitrust Act, 15 U.S.C. § 1. The combinations' members include the majority of banks and financial institutions in the United States, which issue both Visa-branded and MasterCard-branded credit and debit cards. Through their memberships in the combinations, each bank agrees to abide by the rules of Visa and MasterCard, including rules that restrain competition for merchant acceptance of the banks' Credit and Debit Cards.

2. Banks earn income on "Credit and Debit Cards" through fees charged to the cardholder. Credit Cards are payment cards enabling the cardholder to purchase goods or services from a merchant on credit provided by the card issuer, when the merchant has an agreement with the card issuer to accept such cards. Credit Card payment to a merchant for the

goods or services is made by the card "Issuing Bank" on behalf of the cardholder, with repayment by the cardholder subject to an agreement between the Issuing Bank and the cardholder. Debit Cards are payment cards that allow holders of accounts at a bank to pay for goods or services or to obtain cash by directly accessing their accounts. They also include pre-paid cards, which require a prepayment of the amount that can be drawn by the user of the card.

3.      Banks also earn income on Credit and Debit Cards through the "Interchange Fees" paid by merchants. An Interchange Fee is the fee Issuing Banks receive and merchants pay when they accept a Credit or Debit Card issued by a member of the Visa or MasterCard combinations. Interchange Fees account for the largest portion of merchant costs for accepting such cards. Under the agreements by and among Visa and its member banks and MasterCard and its member banks, the so-called "default" Interchange Fees are set by Visa and MasterCard. Interchange Fees are not set to recover Visa's or MasterCard's costs of providing "Network Services." Network Services include, among other things, the services of "Authorization, Clearance, and Settlement" of payment card transactions that the members of Visa and MasterCard have delegated to the networks to provide on the members' behalf. Authorization, Clearance, and Settlement refer to the process by which payment card transactions are completed.

4.      The payment of Interchange Fees and other rules are enforced through "Acquiring Banks." An Acquiring Bank is a member of Visa or MasterCard that acquires purchase transactions from merchants. All Acquiring Banks are members of Visa and MasterCard. As member banks, Acquiring Banks act as gatekeepers, ensuring that card transactions are routed over the Visa and MasterCard networks, that Interchange Fees set by Visa

and MasterCard are paid on all transactions, and that merchants abide by the rules imposed by Visa and MasterCard.

5. Interchange Fees are imposed on merchants by Visa and MasterCard for the privilege of accepting the Issuing Bank's Credit or Debit Card as a means of payment, and are collected from the merchant and paid to the cardholder's Issuing Bank. Interchange Fees are typically set as a percentage of the underlying transaction price and constitute a significant cost for merchants who accept Visa-branded and MasterCard-branded Credit and Debit Cards. Merchants pass these costs on to all consumers through higher retail prices.

6. Issuing Banks compete for cardholders and card usage by offering numerous Credit Card products, some of which offer features such as cash back rebates, low interest rates, low or no annual fees, and usage rewards programs. Cards offering cash-back, airline miles or other usage benefits are often referred to as "rewards cards." Rewards cards that offer the highest levels of rewards are referred to as "premium cards." Standard Credit Cards do not offer the same array of features. Merchants are charged higher Interchange Fees for transactions with premium cards than the Interchange Fees charged for other rewards cards, which are themselves higher than the Interchange Fees charged for standard Credit Card transactions. Merchants receive no additional benefits from the higher Interchange Fees they must pay on rewards and premium card transactions. Nevertheless, merchants do not have the ability to refuse to accept rewards cards.

7. Visa and MasterCard have adopted nearly identical rules or "Competitive Restraints," agreed to by their member banks and imposed on merchants, that eliminate competition among their member Issuing Banks for merchant acceptance of Credit and Debit Cards. The Competitive Restraints include the setting of "default" Interchange Fees, and various

rules such as the Honor All Cards rules, the All Outlets rules, the No Discount rules,[1] and the No Surcharge rules (hereinafter defined). These Competitive Restraints, individually and in combination, prevent merchants from fostering competition among the Issuing Banks and from offering their customers the benefits of using Credit or Debit Cards that are less costly to the merchants. The Competitive Restraints effectively preclude Issuing Banks from competing for merchant acceptance of their Credit and Debit Cards.

8.      As a consequence of having as members nearly all Credit and Debit Card issuers in the United States, and with those members agreeing to Visa's and MasterCard's Competitive Restraints, Defendants and their members have obtained and maintained market power in the United States markets for merchant acceptance of Credit and Debit Cards. In this manner, Visa and MasterCard have unlawfully restrained and continue to unlawfully restrain competition in these markets.

9.      Defendants, on behalf of their member Issuing Banks, have exploited their market power in the markets for merchant acceptance of Credit and Debit Cards by creating Interchange Fee schedules designed to increase the Interchange Fees Issuing Banks are able to obtain from merchants. While Visa and MasterCard nominally refer to these as "default" Interchange Fee schedules, suggesting it is possible for Issuing Banks and merchants to gain different interchange rates by entering agreements among themselves, the Competitive Restraints prevent such agreements. The setting of "default" Interchange Fees effectively fixes the price of acceptance at

---

[1] In 2010, the United States Department of Justice and several states brought and settled claims against Defendants regarding the No Discount rules. The action, *United States of America et al v. American Express Company et al.*, Case No. 10-cv-04496-NGG-RER, was brought in the Eastern District of New York. The action involved allegations of anti-competitive behavior in violation of Section 1 of the Sherman Act. The final judgment as to Defendants prohibited Defendants from undertaking several actions that would limit customer choice and information in a competitive market. *See* Case No. 10-cv-04496-NGG-RER (E.D.N.Y.) at Dkt. No. 143.

a supracompetitive level. By enforcing the Competitive Restraints and supracompetitive Interchange Fees, Visa and MasterCard act as agents of their members for the purposes of exercising the market power gained by their combinations. The exercise of this market power has led merchants to pay excessive Interchange Fees.

10. Previous efforts to curb the exercise of market power by the Visa and MasterCard combinations have been ineffective at diminishing their power to dictate price and prevent competition.

11. In competitive markets, free from the Competitive Restraints and the imposition of "default" Interchange Fees, merchants could use competitive strategies with respect to their acceptance of Credit and Debit Cards, causing Interchange Fees to move to competitive levels.

12. Plaintiffs have paid and continue to pay significantly higher costs to accept Visa-branded and MasterCard-branded Credit and Debit Cards than they would if Visa and MasterCard had not fixed Interchange Fees at a supracompetitive level and if member banks competed for merchant acceptance.

13. Elimination of the Competitive Restraints and restoration of competitive markets for merchant acceptance would substantially reduce Interchange Fees, to the benefit of Plaintiffs.

## II. JURISDICTION AND VENUE

14. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1337, as this action arises under Sections 1 and 4 of the Sherman Act (15 U.S.C. §§ 1, 4) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26).

15. This Court has personal jurisdiction over Defendants because they had substantial contacts with and transacted business throughout the United States, including in this District, and were engaged in an anticompetitive scheme that was directed at and had the intended effect of

causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

16.     Venue is proper in this Court, as provided in 28 U.S.C. § 1391(b) and (c) and in Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15, 22), because Plaintiffs are located in this District and because Defendants transacted business in this District giving rise to Plaintiffs' claims.

## III.    THE PARTIES

17.     Plaintiff MTA is North America's largest corporation transportation network, serving a population of 15.3 million people across a 5,000-square-mile travel area surrounding New York City through Long Island, southeastern New York State, and Connecticut. The MTA network comprises the nation's largest bus fleet and more subway commuter rail cars than all other U.S. transit systems combined.

18.     Plaintiff NYCTA is one of the largest transportation agency's in the world. NYCTA's subways have a daily ridership of more than 5.6 million and an annual ridership in 2016 of roughly 1.757 billion. There is a fleet of more than 6,400 subway cars and there are 472 subway stations, including 117 made accessible to customers with disabilities, via elevators and ramps. NYCTA serves Brooklyn, the Bronx, Manhattan, and Queens, making 8,200 weekday trips.

19.     Plaintiff MaBSTOA, a subsidiary of NYCTA, operates buses in upper Manhattan and the Bronx.

20.     Plaintiff MTA Bridges and Tunnels serves more than 868,000 vehicles each weekday – over 310 million vehicles each year – and carries more traffic than any other bridge

and tunnel authority in the nation. MTA Bridges and Tunnels operates seven bridges and two tunnels in New York City. All facilities use cashless tolling.

21.     Plaintiff LIRR is both the largest commuter railroad and the oldest railroad in America operating under its original name. Chartered in 1834, it extends from three major New York City terminals – Penn Station, Flatbush Avenue, and Hunterspoint Avenue – through a major transfer hub at Jamaica to the easternmost tip of Long Island. With an average weekday ridership of 354,800 passengers in 2016, it is the busiest commuter railroad in North America. It is also one of the world's few commuter systems that operates twenty-four hours a day, seven days a week, year-round.

22.     Plaintiff, Metro-North is the second largest commuter railroad in the nation. Its main lines – the Hudson, Harlem, and New Haven – run northward out of Grand Central Terminal, into suburban New York and Connecticut.

23.     Plaintiff MTA Bus was created in September 2004 to assume the operations of seven bus companies that operated under franchises granted by the New York City Department of Transportation. MTA Bus is responsible for both the local and express bus operations of the seven companies, consolidating operations, maintaining current buses, and purchasing new buses to replace the aging fleet currently in service. MTA Bus operates forty-seven local routes in the Bronx, Brooklyn, and Queens, and thirty-five express bus routes between Manhattan and the Bronx, Brooklyn, or Queens. It has a fleet of more than 1,200 buses, the eleventh largest bus fleet in the United States and Canada.

24.     Plaintiff Long Island Bus operated bus routes on Long Island until December 31, 2011.

25.     Plaintiff SIR operates the Staten Island Railway, the only rapid transit line in the New York City borough of Staten Island. The railway operates twenty-four hours a day, seven days a week.

26.     Plaintiffs accept both Visa-branded and MasterCard-branded Credit and Debit Cards as a method of payment for subway, rail and bus fares and for bridge and tunnel tolls. Accordingly, Plaintiffs have been forced to pay Defendants' supracompetitive Interchange Fees and to abide by the Competitive Restraints. Plaintiffs have been injured as a result of Defendants' anticompetitive conduct as alleged herein.

27.     On July 23, 2019, Plaintiffs timely submitted an exclusion request and became opt-outs from the Rule 23(b)(3) Settlement Class in *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation,* 1:05 - MD - 01720 (E.D.N.Y.).

28.     Until the corporate restructuring and initial public offering ("IPO") described below, Defendant Visa International Service Association was a non-stock Delaware corporation with its principal place of business in Foster City, California. Defendant Visa U.S.A., Inc. was a group-member of Visa International Service Association and was a non-stock Delaware corporation. Visa U.S.A., Inc. had its principal place of business in San Francisco, California. Visa U.S.A., Inc.'s members were the financial institutions acting as Issuing and Acquiring Banks in the Visa system.

29.     Defendant Visa, Inc. is a Delaware corporation with its principal place of business in San Francisco, California. Defendant Visa, Inc. was created through a corporate reorganization in October 2007. Visa U.S.A. Inc.'s member banks were the initial stockholders of Visa, Inc.

30.     Defendant MasterCard International, Inc. was formed in November 1966 as a Delaware membership corporation whose principal or affiliate members were its financial institution Issuing and Acquiring Banks. Prior to the IPO described below, MasterCard International, Inc. was the principal operating subsidiary of MasterCard, Inc.

31.     Defendant MasterCard Inc. was incorporated as a Delaware stock corporation in May 2001. Its principal place of business is in Purchase, New York.

## IV.     THE MARKETS

### A.     Relevant Product Markets

32.     Plaintiffs allege a *per se* conspiracy and therefore need not plead relevant product market; however, the relevant product markets are the markets for merchant acceptance of general purpose Credit Cards and for merchant acceptance of Debit Cards.

33.     Banks compete with one another to issue their Credit and Debit Cards to cardholders who use those cards to purchase goods and services. This competition occurs in the markets for the issuance of Credit and Debit Cards. Absent the Competitive Restraints, banks would also compete over the terms of acceptance of their cards by merchants in the merchant acceptance markets.

34.     Merchant acceptance of general purpose Credit Cards is a relevant product market. For cardholders who seek to access a line of credit, defer payment, or other features offered by the Credit Cards, Credit Cards are not interchangeable with Debit Cards or other forms of tender. Visa and MasterCard and their issuing members are not constrained in the charges they impose for merchant acceptance of Credit Cards by the availability of Debit Cards and other forms of tender as payment options. Merchants cannot discontinue acceptance of

Credit Cards, even in the face of supracompetitive Interchange Fees and Competitive Restraints, without losing sales.

35. Merchant acceptance of Debit Cards is a separate relevant product market. For consumers who seek to pay with immediately available funds or who cannot qualify for Credit Cards, Debit Cards are not reasonably interchangeable with Credit Cards and other forms of tender. Visa, MasterCard, and their member banks are not constrained in the charges they impose for merchant acceptance of Debit Cards by the availability of Credit Cards or other forms of tender as payment options. Merchants cannot discontinue acceptance of Debit Cards without losing sales.

36. Debit Cards are also regulated separately from Credit Cards. In 2011, as mandated by the Durbin Amendment to the Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. 1693o-2, the Federal Reserve Board imposed a maximum level for Debit Card Interchange Fees charged by large banks. The legislation did not mandate that the Federal Reserve Board regulate Credit Card Interchange Fees.

**B. Relevant Geographic Markets**

37. The relevant geographic market is the United States.

38. The default Interchange Fees are set by Visa and MasterCard, respectively, on a national basis. Similarly, the Competitive Restraints are specific to the United States and its territories.

39. Plaintiffs mainly operate within the geographical boundaries of the area surrounding New York City, through Long Island, southeastern New York State and Connecticut, and do business with customers throughout various states in the United States.

40.     Visa and MasterCard, and their largest Issuing Banks, advertise nationally, and pursue promotional strategies aimed at the United States as a whole.

**C.     Market Power**

41.     Visa and MasterCard and their Issuing Banks have market power in the relevant market for merchant acceptance of general purpose Credit and Debit Cards in the United States and its territories.

42.     Prior courts have found that Visa and MasterCard have market power in the general purpose Credit Card market. In 2001, in *United States v. Visa U.S.A., Inc.,* 163 F. Supp. 2d 322, 341 (S.D.N.Y. 2001), *aff'd* 344 F.3d 229 (2d Cir. 2003), the court found that Visa and MasterCard had market power in the market for Credit Card Network Services with Visa having a 47% share and MasterCard having a 26% share of the dollar volume of Credit Card transactions in the United States. In 2003, in *In re Visa Check/MasterMoney Antitrust Litigation,* 2003 U.S. Dist. LEXIS 4965 (E.D.N.Y. Apr. 1, 2003), the court reaffirmed that Visa and MasterCard had market power in the Credit Card market finding that Visa's market share fluctuated between 43% and 47% and MasterCard's share fluctuated between 26% to 28%. Visa's market share has since risen to 50% in 2016.

43.     There are significant barriers to entry into the market for general purpose Credit Cards. The court in *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d at 341, specifically found that there are high barriers to entry into the general purpose Credit Card market. The difficulties associated with market entry are exemplified by the fact that no company has entered since Discover did so in 1985, and Discover has never achieved more than a 7% share of the market. Defendants' Competitive Restraints heighten these barriers to competitors' entry and expansion.

Merchants' adherence to the Competitive Restraints makes it even harder for existing or potential competitors to threaten Defendants' market power.

44.     Competition between Visa and MasterCard has not restrained their respective exercise of market power in the market for merchant acceptance of general purpose Credit Cards. During the period that Visa and MasterCard were both joint ventures consisting of their member banks, they adopted parallel rules that limited competition for merchant acceptance. After their respective IPOs, Visa's and MasterCard's membership, rules, and their power to obtain high Interchange Fees from merchants have not changed and continue to constrain competition.

45.     Merchants are compelled to accept Defendants' Credit and Debit Cards because they would face serious economic and competitive consequences if they ceased to do so. A merchant's efforts to reduce the Interchange Fees it pays by accepting only cards with lower Interchange Fees would violate the Competitive Restraints. Thus, a merchant may resist Visa or MasterCard's high Interchange Fees only by no longer accepting any Visa or MasterCard Credit or Debit Cards. This all-or-nothing choice severely constrains merchants, because it would be economic suicide to refuse to accept such cards when the use of these cards is widespread.

## V.     ALLEGATIONS

### A.     The Combinations

46.     Until recently, Visa and MasterCard were organized joint ventures of their member Issuing and Acquiring Banks. As members of the joint ventures, the Issuing and Acquiring Banks agreed to a collection of restrictive rules, the Competitive Restraints, and to impose those Competitive Restraints on merchants that accept Visa-branded and MasterCard-branded cards.

47.     The Competitive Restraints enforced by Visa and MasterCard, and their actions taken in furtherance of those restraints, constituted and continue to constitute combinations in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

48.     In 2006 and 2008, respectively, MasterCard and Visa each changed their ownership structures through IPOs wherein the member banks partially divested their ownership of Visa and MasterCard. The motivation for these IPOs was to limit the appearance that Visa and MasterCard were controlled by their member banks.

49.     The Visa and MasterCard IPOs did not change the essential character of their combinations or the Competitive Restraints. After the IPOs, neither Visa, MasterCard, nor any of the member banks took any affirmative action to withdraw from the respective combinations. To the contrary, even after the IPOs, the Visa and MasterCard member banks continued to adhere to and enforce the Competitive Restraints that eliminate competition among Issuing Banks for merchant acceptance. Visa and MasterCard have continued to serve as facilitators and coordinators of horizontal agreements among their member banks to adhere to and enforce the "default" Interchange Fees and Competitive Restraints for the benefit of their member banks.

50.     It is contrary to the independent self-interest of any single Issuing Bank to adhere to the Competitive Restraints without the corresponding agreement of the remaining Issuing Banks. Visa and MasterCard, acting as managers of their respective combinations and coordinating agreements to impose and adhere to the Competitive Restraints, have eliminated competition for merchant acceptance. But for the arrangements facilitated by Visa and MasterCard, the member banks would pursue their independent self-interest by competing for merchant acceptance.

51.     Each Issuing Bank is an independently owned and independently managed business. Each Issuing Bank is a separate economic actor pursuing separate economic interests. In other aspects of their business, the member banks compete against one another. For example, the banks compete with one another for cardholders by creating payment card products that offer an array of interest rates, annual fees, purchase rewards, and other features that will make their payment cards more attractive than those offered by other Issuing Banks.

52.     The member banks, however, do not compete for merchant acceptance of the cards they issue. Instead, both before and after the Visa and MasterCard IPOs, the member banks have ceded to Visa and MasterCard the setting of the terms upon which they will allow merchants to accept the cards they issue.

53.     By continuing to agree to and adhere to the Competitive Restraints and default Interchange Fees, the member banks have deprived the marketplace of independent centers of decision - making and, therefore, of potential or actual competition.

### B.     The Competitive Restraints

54.     On behalf of the Issuing Banks, Visa and MasterCard have each adopted and imposed supracompetitive "default" Interchange Fees and other Competitive Restraints that eliminate competition among the Issuing Banks for transaction volume from merchants. Visa and MasterCard include the Competitive Restraints in their contracts with Acquiring Banks. Through these contracts, Visa and MasterCard require Acquiring Banks to obtain agreement from merchants to abide by Visa's and MasterCard's rules, including the Competitive Restraints.

55.     Both Visa and MasterCard claim their "default" Interchange Fees are non-binding, suggesting that their member banks and merchants can enter into their own financial arrangements for merchant acceptance. In reality, however, the Competitive Restraints prevent

such independent action by merchants and member banks. In addition, most Issuer Banks who are members of Visa are also members of MasterCard. Beyond fixing prices within each network, Visa and MasterCard effectively collectively fix interchange fees across networks through communication among their common member banks. Acquiring Banks that do not deduct Interchange Fees when submitting a transaction for Authorization, Clearance, and Settlement are subject to fines assessed by Visa and MasterCard. The Competitive Restraints remove any independent competition among Issuing Banks in the setting of Interchange Fees.

56.     Absent the Competitive Restraints, merchants would pay Interchange Fees for acceptance, if at all, as determined by competition among Issuing Banks. In the cartelized markets created by the Visa and MasterCard combinations, Visa and MasterCard establish Interchange Fee schedules for their member banks.

57.     The Competitive Restraints include a number of restrictive rules, such as the "Honor All Cards" rules. The Honor All Cards rules require that a merchant who accepts any Visa-branded or MasterCard-branded Credit or Debit Card must accept all Visa-branded or MasterCard-branded Credit or Debit Cards, no matter which bank issued the card or the card type. Thus, merchants are precluded from gaining the benefits of competition as to the terms upon which they will accept or reject the cards of any Issuing Bank that is a member of Visa or MasterCard.

58.     Also included in the Competitive Restraints is the "All Outlets" rules which require merchants who accept Visa-branded or MasterCard-branded payment cards to accept those cards at all of their merchant locations. A merchant is not permitted to accept the cards at some stores but not others. All Outlets rules preclude merchants from gaining the benefits of competition as to the terms of acceptance by location.

59. Changes Visa and MasterCard made to their All Outlets rules implemented after January 27, 2013 do not diminish the anticompetitive effects of the All Outlets rules, which still require that if a merchant elects to accept Visa-branded or MasterCard-branded cards at one of its banners, it must accept all such cards at all locations of that banner, and it must accept all such cards no matter the card issuer.

60. Also in the Competitive Restraints are "No Discount" rules. Under the No Discount rules, merchants were only allowed to offer discounts to customers paying in cash. After a 2011 settlement, Visa and MasterCard changed their rules to allow merchants to offer discounts to customers in limited circumstances, but merchants are still prohibited from offering discounts to consumers for using the cards issued by particular banks. These changes to the No Discount rules have not significantly diminished the anticompetitive effects of the Competitive Restraints.

61. Also in the Competitive Restraints are "No Surcharge" rules, which prohibit merchants from surcharging transactions in which a card holder uses a Visa-branded or a MasterCard-branded card. Absent the rules, a merchant could surcharge a transaction in which the consumer uses the card of a particular Issuing Bank, which demands a higher Interchange Fee. Even though Visa and MasterCard have altered their No Surcharge rules to permit surcharges for Credit Card transactions under limited circumstances, these changes still prohibit merchants from surcharging based on the identity of the card issuer.

62. The Competitive Restraints, individually and in combination, eliminate Issuing Bank competition for merchant acceptance. In the absence of these rules, the market for merchant acceptance, including the terms under which merchants would accept an Issuing Bank's cards and the amount of Interchange Fees, if any, would be competitive.

63.     A variety of other rules and regulations (often not publicly disclosed) are also enforced by Visa and MasterCard and their member banks to support the anticompetitive effects of the Competitive Restraints and the imposition of "default" Interchange Fees on Plaintiffs.

64.     The Competitive Restraints, individually and in combination, eliminate the incentives for Visa and MasterCard to compete with each other for merchant acceptance through setting lower "default" Interchange Fees. The Competitive Restraints, including the setting of "default" Interchange Fees, are not reasonably necessary to accomplish any legitimate efficiency-generating objectives of the Visa and MasterCard combinations. Furthermore, there exist numerous alternative means that are less harmful to competition by which any such objectives could be accomplished.

### C.     Harm to Competition

65.     Visa and MasterCard use their market power to impose "default" Interchange Fees and the other Competitive Restraints on merchants.

66.     The Competitive Restraints are directly aimed at restraining competition, making it impossible for merchants to gain the benefits of competition as to the acceptance terms, including lower Interchange fees, more favorable terms, innovation, and differentiated services. But for the Competitive Restraints, competition among Issuing Banks for merchant acceptance would result in lower Interchange Fees.

67.     Defendants' Competitive Restraints remove tools that merchants in a competitive marketplace could use to negotiate lower Interchange Fees, reduce their costs of doing business, encourage their customers to choose a low-cost payment method, and keep retail prices lower for their customers.

68.     Plaintiffs have been harmed by the actions of the Defendants. Plaintiffs accept Visa-branded and MasterCard-branded Credit and Debit Cards and have been forced to abide by Visa's and MasterCard's Competitive Restraints. Visa's and MasterCard's supracompetitive Interchange Fees have led to increased prices for Plaintiffs.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of Section 1 of the Sherman Act

69.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 68 as if fully rewritten herein.

70.     The statute of limitations has been tolled for all merchants that are putative members of the class action initiated, by information and belief, in *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation,* 1:05 - MD - 01720 (E.D.N.Y.). Because Plaintiffs fall within that class, the statute of limitations has been tolled since at least October 20, 2005.

71.     The use of Credit and Debit Cards issued by members of Visa and MasterCard and the rules governing the use of such cards occur in and have a substantial anticompetitive effect on interstate commerce.

72.     Visa and MasterCard and their members jointly have market power in the market for merchant acceptance of general purpose Credit and Debit Cards.

73.     Visa and MasterCard and their member banks are combinations within the meaning of Section 1 of the Sherman Act. Visa's and MasterCard's rules and related contracts constitute agreements within the meaning of Section 1 of the Sherman Act. Each of the Defendants' Competitive Restraints, as defined above, constitute *per se* horizontal agreements among Defendants and their member banks, both prior to and after their reorganizations and

IPOs. Visa and MasterCard have served and continue to serve as the managers of combinations that limit competition among the bank members of the combinations through the Competitive Restraints adhered to by those members. Accordingly, by these arrangements, Visa and MasterCard have facilitated and continue to facilitate a horizontal agreement among their members, who would otherwise compete for merchant acceptance of the Credit and Debit Cards each issues.

74.     In addition, Visa's and MasterCard's rules and related contracts, entered into before the IPOs, constituted a horizontal agreement from which Visa and MasterCard and their member banks have never withdrawn. In changing their corporate form at the time of the IPOs, Visa and MasterCard did not take any affirmative actions to end their existing anticompetitive arrangements.

75.     Individually and in combination, the Competitive Restraints constitute an illegal agreement to fix the price of acceptance of Visa-branded and MasterCard-branded Credit and Debit Cards and to prevent the operation of and interfere with the competitive process with respect to merchant acceptance of Visa-branded and MasterCard-branded Credit and Debit Cards, in violation of Section 1 of the Sherman Act.

76.     Plaintiffs have suffered antitrust injury as a result of Visa's and MasterCard's Competitive Restraints. The effect of these Competitive Restraints has been to increase the cost of acceptance of Credit and Debit Cards by Plaintiffs, thereby injuring Plaintiffs.

**PRAYER FOR RELIEF**

77.     WHEREFORE, Plaintiffs pray that final judgment be entered against each Defendant declaring, ordering, and adjudging that:

(a)     The aforesaid combinations and agreements unreasonably restrain trade and are illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1;

(b)     Each Defendant be permanently enjoined from engaging in, enforcing, carrying out, renewing, or attempting to engage in, enforce, carry out, or renew the agreements in which it is alleged to have engaged, or any other agreement having a similar purpose or effect in violation of Section 1 of the Sherman Act, 15 U. S.C. § 1;

(c)     Each Defendant eliminate and cease enforcing all Competitive Restraints and be prohibited from otherwise acting to restrain trade unreasonably;

(d)     Plaintiffs be awarded damages, their costs of this action, reasonable attorneys' fees, and such other relief as may be appropriate and as the Court may deem proper; and

(e)     Plaintiffs demand a trial by jury of all issues properly triable thereby.

Dated: July 23, 2019

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

By: *s/ Jeffrey G. Smith*

Jeffrey G. Smith
Regina Calcaterra
Thomas H. Burt
Veronica Bosco
270 Madison Avenue
New York, New York 10016
Tel:  212-545-4600
Fax:  212-545-4653
Email:  smith@whafh.com
         calcaterra@whafh.com
         burt@whafh.com
         bosco@whafh.com

*Attorneys for Plaintiffs*